GEO. S. BUSH & CO., INC. *v.* UNITED STATES

No. 6061.—Invoices dated Vancouver, B. C., Canada, June 30, 1942, etc.
Entered at Seattle, Wash., July 3, 1942, etc.
Entry No. 9, etc.

(Decided October 23, 1944)

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett, Richard E. FitzGibbon*, and *Richard F. Weeks*, special attorneys), for the defendant.

Cole, Judge: Reed-Prentice of British Columbia, Ltd., exclusive manufacturers of Timberhog gasoline and electric power saws and parts thereof, exported two shipments which included both kinds of saws and parts, in July 1942, to Loggers & Contractors Machinery Co. of Portland, Oreg. Plaintiff corporation, customhouse brokers, entered the merchandise at Seattle, Wash., on the basis of the invoice values which the appraiser advanced by 25 per centum in his appraisement at foreign value, section 402 (c) of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938 (19 U. S. C. 1940 ed. § 1402 (c)), which the statute defines as follows:

The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which *such or similar* merchandise is *freely offered* for sale for home consumption to all purchasers in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. [Italics mine.]

Plaintiff's principal claim is that foreign value is not the proper basis for appraisement because the Canadian market, at the time of exportation, was a restricted or controlled market. Another reason assigned is that the gasoline saws sold for use in the foreign market are not "such or similar" to the ones sold for export. It is alternatively claimed in plaintiff's brief that if the court should find that "a 'foreign' value for any of these articles did exist, the invoice price plus 12½ per centum represented such value."

*United States* v. *Heemsoth-Kerner Corp.*, 31 C. C. P. A. 75, C. A. D. 252, is the cited authority for plaintiff's claim of a controlled foreign market. In that case, Bauer Type Foundry, Inc., the importer and exclusive United States agent for the foreign manufacturer of the printed type in question, appointed distributors to sell in certain specified territories. Under the terms of a written contract, said Bauer Type Foundry, Inc., bound itself not to permit sales in any allotted district, except by the distributor, whose sales were limited to consumers or users and only at net prices fixed by the importer who also exercised control over the use of merchandise sent to the distributor. In some districts not included in any distributor's territory, said Bauer Type Foundry, Inc., appointed agents, having the privilege to sell in their respective localities at prices fixed by the principal. Orders obtained by an agent were transmitted to Bauer Type Foundry, Inc., who billed the goods direct to the customer, allowing proper credit for commission to the agent. The principal market, New York, and other unassigned territory were reserved by the importer who sold direct to consumers, without any participation by a distributor or agent, at net prices. In holding such a market to be a controlled one, the court said:

\* \* \*. That the market was restricted and controlled in respect to distributors both as to price and territory admits of no doubt. The appellee itself is bound not to permit sales in a territory where it has a distributor by any person other than the distributor, except in an emergency, and the retail price at which the distributors may sell is fixed by appellee. As for the sales by agents they are, in legal effect, sales by appellee. Appellee itself sells no type for resale, except that sold to the distributors, and if a distributor takes for its own use some of that which it purchases, it must pay the list price for it, without discount.

So, while it appears that the merchandise is freely offered by appellee for sale in the principal market at list prices to all purchasers in some portions of the United States, it is not freely offered for sale by appellee at such list prices in such principal market to purchasers in territories allotted to distributors, which territories cover a major portion of the United States. Therefore, it may not be held that it is freely offered for sale in the principal market to all purchasers in the ordinary course of the trade within the meaning of section 402 (e), *supra*. \* \* \*.

With the view of establishing a factual basis for application of the legal principle thus announced in the *Heemsoth-Kerner Corp.* case, *supra*, the Canadian exporter's sales manager, Arthur Verdon Stedham, testified concerning the method followed by his company in selling its merchandise in the Canadian market. The witness appeared at both hearings of the case in Seattle; first in August 1943, prior to publication of the decision in the cited case, before Ekwall, J.; and later, after said decision was rendered, at the trial before me in February 1944 when the case was finally submitted. His testimony contains contradictions, presenting a rather confusing record as the following summation discloses: Reed-Prentice of British Columbia, Ltd., marketed its merchandise through dealers and jobbers as well as direct to consumers or users. Dealers bought at 25 per centum less on the complete saws, and 20 per centum less on parts, from the prices charged consumers. Jobbers, usually machinery houses, that bought for resale, were allowed a 10 per centum discount. Consumers or users paid net prices. The company employed no salesmen because "production hasn't been sufficient to keep up with the demand by mail and inquiries, and orders over the counter." Three dealers represented the Canadian manufacturer in different parts of Canada: Pulp & Paper Mill Accessories, Ltd., covered Quebec, Ontario, and all the eastern Maritime Provinces; Waterous, Ltd., was assigned the Province of Alberta; and Syd Smith, Ltd., had the interior of British Columbia which included the district in and around Kamloops and the Okanagan Valley. The relationship between the manufacturer and its dealers was established under a "letter agreement." Although such agreement allowed the dealers "exclusive selling rights in certain territories in Canada," the witness admitted that his company reserved the right to sell to customers located in a dealer's area, but always allowing the dealer his commission. This important testimony is quoted (R. 40–41):

X Q. * * *. What was the nature of the arrangement that you had with such purchasers?—A. We agreed to allow them exclusive selling rights in certain territories in Canada.

X Q. Did you reserve the right to sell direct in their territories?—A. No, we did not.

X Q. But you did sell direct, did you not, in their territories? In some instances?—A. Not unless we allowed them the commission on the sale.

X Q. Yes, but you then were permitted to sell direct, provided you allowed a commission to the dealer to whom you had given the sales territory, is that right?—A. Yes.

X Q. And you would not refuse to sell direct to anyone who wished to purchase, would you, from you?—A. No.

X Q. In any territory in Canada, I mean under the arrangement of paying a commission to someone?—A. No, we wouldn't.

X Q. You would not refuse?—A. No.

X Q. And you did actually sell direct and pay, or give a commission to your dealer, did you not?—A. I couldn't say.

X Q. You don't know whether you made any sales direct in the territories of dealers?—A. No.

X Q. But you reserved the right to do so, is that right?—A. We reserved the right to do so.

In the absence of the actual agreement establishing the relationship between the parties, the testimony is sufficient for finding that the Canadian manufacturer was free to sell at consumers' prices to anyone in the principal market of Vancouver. Orders from customers located in the assigned areas were acceptable without violating any contractual arrangement or infringing upon rights of a dealer.

The situation was comparable to the agency that existed in the *Heemsoth-Kerner Corp.* case, *supra*, and the transactions were like those which the court held to have the legal effect of being made by the principal. The restrictions imposed between the importer and its distributors in the *Heemsoth-Kerner* case, creating a controlled United States market, did not exist between Reed-Prentice of British Columbia and its dealers in the Canadian market. Therein lies the distinction, based upon testimony adduced at the first hearing, between the present case and the cited one.

The conclusion, however, cannot be definite in the light of subsequent testimony by the same witness at the later hearing referred to. His direct examination, at that time, includes the following (R. 183):

Q. What were the conditions under which you sold saws to Pulp & Paper or to Syd. Smith, or to Waterous, at a price which was 20 per cent less than the price at which you sold to consumers?—What were the conditions of those sales, please?—A. Well, we sold them on a dealer basis, which is 20 per cent less than our consumer price.

Q. Yes, sir.—A. And we assigned them a certain territory to sell those saws in.

Q. Was the condition then that they observe that assignment as to the territory?—A. Yes.

Q. And in addition to assigning them to a particular territory did you exclude them from any other territory?—A. Yes.

Q. One follows the other, I guess. Did you during the time in question, the first six months of 1942, receive inquiries from persons who wished to purchase these saws and who were located, let's say in the Eastern Provinces?—A. Yes.

Q. Did you sell as a result of such inquiries?—A. No, we didn't.

Q. What did you do?—A. Turned it over to our dealer.

Q. By doing that, what do you mean? I don't understand.—A. Well, we would accept the order, and invoice through our dealer, allowing him the jobber's price, and he in turn would invoice the customer.

Q. That is your answer, may I take it, Mr. Stedham, where a person said, "I want to buy from you one saw at a certain price," is that right?—A. Or if we shipped it direct from our own factory, then we would give him a credit.

Q. Yes. Now I want to know, though, as to what your response was in regard to the sale of these saws—suppose I wrote to you and said, "I like these saws. How much are they?" What would you do about that, if I lived in Ontario?—A. I would send you a descriptive folder, and refer you to our dealer for price and delivery.

Q. I see. And that was your practice?—A. Yes.

And his testimony on cross-examination contains the following contradictions of earlier statements (R. 220):

X Q. * * *. Now, isn't it a fact that anybody in the Dominion of Canada, by calling your office, can purchase a four-foot saw from you for the price of $625?—A. No, sir.

X Q. Well, who can't?—A. Customers who are in our dealers' territory.

X Q. Well, at what price do they purchase it?—A. We don't set the price to our dealers.

\*       \*       \*       \*       \*       \*       \*

X Q. Well, suppose somebody, or you got a letter from somebody, and they lived in the territory of Ontario, and they asked you if you would sell them a saw, and they sent you a certified check for $625 and said, "Will you kindly ship us one of your saws," would you do it?—A. No.

X Q. What would you do?—A. We would refer them to our dealer.

X Q. Now, is that true in the Syd. Smith territory?—A. Yes.

X Q. Of British Columbia, the interior of British Columbia?—A. Yes.

Further contradiction of oral testimony was revealed through an analysis of the group of 49 invoices (collective exhibit 1) representing all sales by the Canadian manufacturer during June 1942, and 5 in the month of July 1942. Three of these invoices show direct sales by the manufacturer to customers in Alberta, territory which the witness had testified was exclusively allotted to Waterous, Ltd. Asked (R. 224), "How did you happen to sell in the Waterous territory?" he answered, "The reason was that we didn't have an exclusive territorial agreement with Waterous." An examination of the invoices shows no transactions with Waterous, Ltd., within the period covered thereby.

The inconsistencies in plaintiff's line of proof do not permit a positive finding concerning applicability of the *Heemsoth-Kerner Corp.* case, *supra*, with consequent conclusion on the question of a controlled foreign market. Without a determination of such issue, and favorable to plaintiff, I am precluded from considering the claim that the

price to jobbers is the dutiable foreign value of the merchandise.

Testimony relating to the comparability of the gasoline saws sold for use in Canada and those sold for export to this country was also offered by said witness, Stedham, who described the differences between the two articles as follows (R. 35):

* * *. The only difference was on the Model K 8-horsepower machine, and it is only fittings. There is a different type of carburetor on the machine shipped to the American market than there was on the saws sold in Canada, and that entailed the changing of certain fittings on the machine, but there was no difference in the internal part of the motor at all, just in the controls.

Details concerning the differences were elicited in the following examination by plaintiff's counsel:

Q. Do you know what fittings were different on the American machine than on the Canadian machine?—A. Yes.

Q. Will you enumerate what they were, please?—A. A different type of carburetor or manifold, and different throttle wire and throttle casing, and throttle control lever.

Q. What type of carburetor was on the machines exported to this country?—A. Tillotson Carburetor.

Q. What type of carburetor was on the machines sold for home consumption in Canada?—A. What we call the Reed-Prentice type, manufactured by ourselves.

Q. Did you carry in stock in Canada each of those carburetors?—A. Yes.

Q. Do you know what their prices were, say, during the first six months of 1942?—A. Yes, I believe I can give you that. Tillotson—did you want me to answer it?

Q. Yes. Will you tell us what the prices were for each of the different carburetors?—A. The Tillotson Carburetor would be $17.30.

Q. Is that July, 1942?—A. Yes.

Q. The Reed-Prentice?—A. The Reed-Prentice, $35.

Q. To whom did those prices prevail? What kind of a price was that?—A. Those were the prices to the dealer.

Q. I see. In both instances?—A. Yes.

Q. Now, were there any other differences between any of the attachments to the saws that were exported to this country and those used for home consumption?—A. Any other difference?

Q. Yes.—A. Yes, there was in the spark, and the exhaust pipes on the motors.

Q. What was that difference?—A. Well, the difference was caused by U. S. Forestry laws which demanded that we put on a spark arrestor, or that the dealer who distributed these saws have them equipped with a spark arrestor to save any possible danger from fire in the woods.

Q. Which saw was equipped with a spark arrestor?—A. The saw sold to the American dealer only.

Q. Were the saws that were sold for use in Canada, and in their condition as sold for use in Canada, suitable for use in the United States?—A. Yes.

Q. Were they suitable for use without having the spark arrestor you have just referred to? Could they be used?—A. Yes, they could.

Q. Do you know whether such a use would have complied with the Forestry regulations on that subject?—A. We are given to understand that it wouldn't. Whether that applies all over the States I couldn't say, but it did in certain states.

Q. What states?—A. Oregon, the only one I know of.

Corroboration of the above testimony relating to the differences between the American and Canadian gasoline saws was given by James M. Meany, who is in charge of sales by the importing company in Portland, Oreg.

The question of similarity for appraisement purposes between a product used in the foreign market and a comparable one sold for export has been the subject of much customs litigation, but throughout the long series of cases no definite rule has been announced that may be applied to every situation. *United States* v. *Massin*, 16 Ct. Cust. Appls. 19, T. D. 42714, contains the following interpretation of the word "similar" as used in the statute governing appraisement (19 U. S. C. 1940 ed. §1402):

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b). The importer or foreign manufacturer may not, by making a few changes in structure, or in giving the product a new name, or by restricting its sale to the American purchaser only, *ipso facto* remove his merchandise from section 402 (b), the foreign value provision.

In a later case, *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837, the court enlarged somewhat on its earlier pronouncement in the following language:

\* \* \*. The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402 (b).

The use of the Reed-Prentice carburetor on these gasoline saws was preferred by Canadian loggers because "the opinion was that the Reed-Prentice type carburetor would operate more satisfactorily if the motor was on an angle, than the Tillotson Carburetor." But an article is not to be regarded as dissimilar "solely because of the whims or petty prejudices or like considerations of the trade." *Scharf Bros. Co.* v. *United States*, 16 Ct. Cust. Appls. 347, T. D. 43089. Nor is a difference in costs of the two kinds of carburetors a bar for finding similarity. *Scharf Bros. Co.* case, *supra*. The spark arrester carries an extra cost only if bought separately. When included as an integral part, it does not affect the regular price of the saw. The vital and controlling factor, so far as the gasoline saws under consideration are concerned, is that neither their use nor inherent qualities are changed, or in any way modified, by the different types of carburetors employed

by each and the spark arrester fitted to the American saw. They are "similar" for appraisement purposes within the judicial interpretation of the term as announced in the cited authorities.

The record before me fails to show any dutiable values for the merchandise in question than those found by the appraiser, which I hold to be the foreign values, within the meaning of amended section 402, *supra*. Judgment will be rendered accordingly.

In view of the conclusion herein, it becomes unnecessary to discuss the evidence introduced by both parties and the related questions of law concerning United States value, section 402 (e) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1402 (e)), and cost of production, section 402 (f) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1402 (f)).